nce Company, Mr. Yanov. We'll hear from you. May it please the Court. This case is about an insurer's inability to pick and choose which insurance policy it would like coverage under to the exclusion of the policy's actual language and provisions. I represent the insurer, Lexington Insurance Company. I'll be addressing two issues that overlap between the two appeals. First, whether the professional and medical care exclusions in the CUL and CGL policies exclude coverage here. And second, whether the civil rights endorsement in the CGL policy, which is the only place it's found, is harmonized or irreconcilably conflicting with the medical services exclusion. This is obviously a four-corners analysis under a duty to defend obligation, so we look to the pleadings and the policies. In the underlying case, Garcia alleged that LCS, a privately funded prison, failed to give medication to an inmate, Mr. Garcia, and that that failure to give the medication caused his death. Lexington defended the case and to this day has defended that case under a health care professional liability policy that LCS had. The posture of the case now is the failure to provide the medication by LCS has been proven in a trial to have caused the death of Mr. Garcia. The case that has been tried already was a negligence case and it was proven that the nurse's negligence caused the failure to give medication was negligence and that that failure to give the medication caused the death of Mr. Garcia. Post-verdict, Garcia has revived their civil rights claim and that claim is pending. So unlike all of the cases dealing with whether or not there's coverage or duty to defend, what makes this case different from the start is it has already been proven that the failure to give the medication is the cause or a cause of the inmate's death. LCS is being defended under the HPL policy but they seek coverage under the CGL and CUL policies. The CUL policy has a professional liability exclusion and it says that there is no coverage arising out of the rendering of or failure to render professional services. The district court found that this exclusion applied and excluded coverage under the CUL policy and in the chart that I've provided, it's actually the second page of the chart, it shows a side by side of these two exclusions. The professional liability exclusion applies to any professional services. It's not limited to medical, nursing, dental, those types of services. It's any professional services. Arising out of is the key language in the professional liability exclusion. Similarly, the medical services exclusion applies to any medical, nursing, surgical, or dental treatment, the failure to give or rendering. It's arising out of once again. What's more specific about the medical services exclusion is it has a drop down list of four scenarios. And the A provision is rendering or failing to render medical, surgical, dental, or nursing treatment. And it includes, it has arising out of language up above and it includes all of those scenarios, failing or rendering those types of services. B, C, and D are not more specific scenarios. What they are instead is covering even more than what A covers. And LCS has characterized this as A is kind of this catch all, but B, C, D really addresses the more specific provisions. The problem with this interpretation is these A, B, Cs, and Ds are separated by an or, not an and. And so if any of the four are satisfied... How are C and D separated by an or? There's an or between A and B. Well, there's an or between C and D, yes. But B specifically refers to dispensing drugs. It does, but it's not it's addressing a more specific scenario than just it's about dispensing drugs. The key phrase in B is if the injury occurs after the name insured has relinquished possession thereof to others. So A would cover a scenario where it's giving or failing to give medication by LCS or by an LCS employee. What B covers is beyond that. It is arguable that if LCS hands the medication to a third party, let's say it's an independent contractor. Or a nurse. Well, a nurse not employed. A nurse who's not a named insured. Someone who dispenses medicine at the prison. Yes, but who's not an LCS employee. That's the key thing. Because if they're an LCS employee, they're covered by A. So B is you hand it to a third party and they either give or fail to give the medication. Arguably, that's not excluded under A because it's not the insured who gave or failed to give. It's a third party. And there would be coverage in that scenario. But B makes it clear that even in the scenario where you hand it to a third party and they give or fail to give the medication, that too is excluded. And so it's not covering this situation because the allegations in this case that Garcia alleges is, LCS held on to the meds and they failed to give the meds. That's at 182 and 183 of the record in the 494 appeal. And it says that LCS held on to it. So B is just an inapplicable situation here. But in any event, that's not how an exclusion is interpreted when it has an A, B, C, or D provision. The insured does not get to pick which one they think they fit under and which one they think they get insurance under to the exclusion of other exclusions within that subprovision. And LCS acknowledges that, at least in theory, that if any of the four apply, then they don't have coverage. And A clearly applies here. And B is addressing simply a different scenario. The other key language in the medical services exclusion and the professional liability exclusion is arising out of. LCS argues that exclusions even with arising out of language are narrowly construed. And the way they get there is by arguing that duty to defend has a preference towards coverage. And therefore, if there's any question, you get coverage despite arising out of language. The problem is that's contrary to what this court has said. This court in Scottsdale Insurance said that when an exclusion precludes coverage for injuries arising out of described conduct, the exclusion is given broad, general, and comprehensive interpretation. And a claim need only bear an incidental relationship to the described conduct for the exclusion to apply. All of the cases relied on by LCS to argue coverage involve policies that do not contain arising out of language. The Texas Supreme Court case, Utica, has due to language. The Brooks case, an unpublished Louisiana case, again has due to language. American Casualty, again has due to language. These policies used due to language, which is not interpreted broadly like arising out of. And the Utica case describes that very specifically. In the Utica case, they found the exclusion did not apply because it had due to language. And at the end of that opinion, they all but say if it had said arising out of, this would be a different result. Because arising out of is interpreted more broadly. And they describe the difference between those two. There's two dissenting justices in that case, Justice Owen and Justice Hecht, who would have found the exclusion applied anyway. But arising out of is more broadly interpreted. The case that's most on point is a Texas case, Duncanville Diagnostic. Ironically, despite what I just said, Duncanville Diagnostic, the policy used due to language. But that case involved allegations of administering an overdose to a patient. And the allegations were that that was negligence, negligent medical care. And there were also allegations that they failed to adequately train their staff to provide medications in the proper manner. And they failed to institute adequate policies. The policy at issue in that case had a professional services exclusion just like this one, except that it actually used due to language, not arising out of. The court held that all of the claims, the policy claims, the administrative claims, and the negligent medical care claims were barred by the exclusion. And the language they used is, the essence of the allegation is that Erica's death arose out of the failure to render proper medical services, which in turn arose out of negligent hiring, training, et cetera, and failure to establish policies. There would have been no injury in this case and no basis for the lawsuit without the negligent rendering of professional medical treatment. Stated more specifically, Erica's death could not have resulted from negligent hiring and policies without the negligent rendering of professional medical services. That's exactly what we have here. Whether there is a policy or not about administering medications, the death does not occur except that the nurse failed to give medications in this case, despite a doctor's order. That's not only an allegation in this case, but it's been proven to a jury. And the district court has made it clear that that issue will not be retried. It is undoubtedly a cause of Mr. Garcia's death. Whether there are other causes is not really relevant here because we know what a cause is. The Duncanville Diagnostic Court said we don't even need to get into concurrent causation because we know at the end of the day, the cause or a cause has to be the negligent medical care. And it's the same thing here except one step beyond that because it's already been proven to a jury and we know what a cause is. Even if the court addresses concurrent causation though, the result will be the same. It is only independent or separate causation if each act by itself can cause the death. Well here, it's already been proven that a cause of the death to a jury was negligent nursing care. So there can't be independent causation for a civil rights violation. It has to be at best concurrent causation for LCS, which again means the exclusion applies. Because the exclusions apply, the only other question becomes whether the civil rights endorsement in the CGL policy conflicts or harmonizes with, and that's our first chart with the circles in it. The left side is what LCS argues. They argue that the medical services exclusion irreconcilably conflicts with the civil rights endorsement. And they argue that there's a preference again towards coverage when you're interpreting an endorsement and an exclusion. Again, that's not accurate. The only way the endorsement is preferred to Trump or assumed to Trump is when it's an endorsement versus broad form boilerplate language. Well that's not what we have here. What we have here is an endorsement versus an exclusion. And more accurately, it's an endorsement providing coverage versus an endorsement excluding coverage. It's two endorsements against each other. And in that instance, this court has said on numerous occasions that there is a preference towards harmonizing, which is the right side of this chart, and that the court tries to harmonize. And the only way this court cannot harmonize it is if the exclusion in essence eats up the endorsement on every occasion. If the exclusion is so broad that it cannot, that the endorsement cannot provide coverage under any instance or any category of allegations, well then it's irreconcilably conflicting. Again, that's not what we have here. The civil rights endorsement provides coverage for a number of allegations. For example, if LCS personnel beat an inmate, that would be covered by the civil rights endorsement. It would not be excluded by the medical services exclusion. The most recent U.S. Supreme Court case on the civil rights allegation is whether prisoners can wear neatly trimmed beards based on religious beliefs. Again, given that Supreme Court case, if a prison did not allow an inmate to wear a neatly trimmed beard, that would be a civil rights allegation, but it would not be excluded by the medical services exclusion. What we have here is the medical services exclusion excludes allegations of rendering or failing to render medical services. Anything that bears an incidental relationship to that is also excluded, which would include a civil rights violation that touches on medical care. That is a small category that is excluded from the civil rights endorsement. Thank you. Thank you, Mr. Yanoff. Mr. Chris, we'll hear from you. Representing Mr. Garcia. My name is William Chris. I represent the Garcia family. I just want to say three or four things before LCS's counsel addresses more about the merits of the appeal. First, I want to make clear, there is no jury verdict in this case that finds any professional negligence on anybody. The only nurse and doctor whose conduct was specifically submitted to the jury were exonerated by the jury in this case. There is a general finding of negligence. Counsel's admitted this is a four corners case, and the only allegation of negligence that currently exists against LCS is that they non-professionally, as a matter of policy, withheld from all prisoners all medications. Second thing I want to say is that with respect to the umbrella policy, the controversy is not ripe. The verdict was based upon the policy of the prison? The verdict doesn't specify the negligence of LCS, but only LCS was found negligent. The only nurse and doctor whose conduct was submitted to the jury were exonerated by the jury. There's no finding of medical negligence. Thank you. May it please the court. And in fact, in the trial, there was testimony from the warden. You need to state your name, Arthur. I'm sorry. Brent Cooper here for LCS. There was testimony from the warden about their policy of not allowing inmates to bring into the prison their own medications, particularly psychotropic medications. So that was from the warden who was a non-medical provider. Now, a couple things real quick. This chart that was given doesn't reflect what our argument is. It would be accurate with respect to their occurrence argument, because they're saying if it's a civil rights violation, it can't be an occurrence, but they give us civil rights coverage by endorsement. But they say it can never be an occurrence. So that would apply to this. They're charging us for some coverage which they say could never ever apply because it could never be an occurrence. That is just wrong. We know from what the trial judge said the fact that you have a civil rights violation doesn't necessarily mean that you intended the injury. And that isn't federal law. That isn't state law. And that's certainly we don't believe what was meant by Lexington when they charged a premium for civil rights coverage. Now, with respect to the medical services endorsement, in order for Lexington to get where they want to go, they pretty much have to violate every rule of policy construction that's been handed down by this court, and more specifically by the Texas Supreme Court. For example, this court, City of College Station case that we've cited, Supreme Court, the Utica case has said, when we're dealing with words of exclusion, we're going to interpret those very narrowly. Of course, they say A covers pretty much everything. Violate that rule. Number two is the court, since it is an exclusion, is required to adopt the insurance interpretation or insurance reasoning, even if the insurer's reasoning is more reasonable, so long as the reasoning proffered by the insurer itself is not unreasonable. The Nakia case of the Texas Supreme Court says that. The Utica case says that. We have proffered an explanation which we believe is reasonable. And that is, if you go to the medical services exclusion, A talks about medical, surgical, dental, or nursing treatment. Okay? Those four. Then it goes on to say, including the furnishing of food or beverages in connection therewith. Now, first off, if they had wanted to include dispensing or furnishing of drugs in connection therewith, they could have put it in there because we know they know how to do it, but they didn't. Then we go down to B, which is furnishing or dispensing of drugs or medical or dental supplies or appliances. When we talk about furnishing or dispensing of drugs, generally we're not talking about medical, surgical, dental, or nursing treatment. We're talking about what a pharmacist does, dispensing drugs at a... The pharmacist would dispense, I think, if you look under the Texas Pharmacy Act, they dispense the drugs in response to a prescription. And so, otherwise, and that gets us down to Rule 3, which I think brings this into all play. The court is required to view all portions of the policy must give meaning to every word and provision. Texas Farmers v. Murphy, the Texas Supreme Court in 1999 said that. It's been said many, many times. You can't say certain words have meanings and certain words have no meanings. If they're right, and medical, surgical, dental, and nursing treatment includes pretty much everything, then why do you need B, which is what they're saying, medical, surgical, nursing, or dental? Why do you need C, which is the handling or performing... For me, he's saying Mr. Yanov said that it... Once you've dispensed them... Third parties, yeah. Correct. Once you've dispensed them to the patient, then you're not covered. Or what you... Is that the third party he's talking about? Well, we don't know. They drafted the policy, and the question is, if there's an interpretation that's reasonable, the court's required to go with our interpretation, even if their interpretation is more reasonable because they drafted the language. They could have put dispense to third persons, but they didn't say that. They just said dispensing a food or drug after it's been relinquished possession thereof to others. And that is, if you actually dispense the drug to a patient who is... The patient would not be an insured or independent contractor, and there's some adverse reaction, you dispense the wrong drug, you give too much of the drug, then they're... According to their policy they drafted, there would be no coverage. That is an interpretation of that. I thought you said dispensing was what the pharmacist does. I do. Now you just did it to give it to the patient. I'm saying there are multiple reasonable interpretations. Ours is, this doesn't apply to medical, surgical, dental, or nursing treatment. Theirs is, yes it does, and I'm saying even if it does, the question of dispensing to others could be to the patients as an interpretation that would be reasonable. That is, we're not going to cover once it's been given to others, but if it hasn't been given, then we would cover that. And that is a well-founded maxim of policy interpretation. Number four is, when the policy or endorsement broadens coverage, directly conflicts with an exclusion, again the court's required to indulge in every reasonable interpretation to find coverage. Now, the other thing they say is, we have a specific endorsement, the negligent acts endorsement, which includes professional services. So, with the negligent acts endorsement, they give us professional services. With the medical professional services endorsement, they sort of take away, so they've got two arguments they can make. One is that professional services must not include medical services, and if that is their argument, it nails them on the umbrella policy. Or, they've got to take the position that, well, they're just in conflict, and we wrote the policy in conflict, which I don't think they want to do. The trial judge had this before her. She saw, she had as far as what the underlying trial evidence was, and determined that the medical services affidavit, a reasonable interpretation was, it doesn't apply when there has been the relinquishment of the drugs to others. If it hadn't been relinquished, then there is coverage. That is a reasonable interpretation. Obviously, I would assert it's a reasonable interpretation, if it's the interpretation given by an Article III district judge. You're equating that to infallibility? I would not, and I know some judges who might equate that, but no. I'm just saying it's not infallible. It doesn't have to be perfect. It just has to be a reasonable interpretation. If we have an Article III judge saying, this is the way I interpret it, I would assert that is a reasonable interpretation. Even if their interpretation is more reasonable, we, the court, is required to go with the one that favors us, so long as it is a reasonable interpretation. Or if there are two reasonable interpretations. If there are two reasonable interpretations, one that favors us, one that favors them, you go with the one that favors us, according to the Texas Supreme Court and the Nakia case. Many times, there are more than one reasonable interpretation. The reason we have this rule is, it's the insurance company who drafts the policy, and they have the ability to control the language, and if they didn't want the language to say that, they could have done it that way, and it's the old rule of contra pro foreno. And if they wanted it to say something, they should have drafted it, they didn't, and so long as the interpretation we're offering is reasonable, even if there is another reasonable, or the court said, even if there is an interpretation which is more reasonable, you go with the one that's being proffered by the insured in favor of coverage, when we're dealing with exclusions. When we're dealing with words of exclusions, you go with the one that favors the insured. Now, the umbrella policy. Again, they have the issue, they never define what are professional services. You have one argument about, well, does it include medical services, since under the primary policy, you've granted it on one hand, and you're trying to take away on the other, but I don't even think you have to get there, because the law is, if you have both professional and non-professional violations being asserted, that there can be coverage for the non-professional services. The pleading that we've had here, and again, we don't have a finding yet in the 1983 case, alleges both professional and non-professional services. The Garcias allege that a policy custom pattern and practice of deliberate indifference to the medical needs of inmates, and that there was no professional or medical discretion exercised in the failure to supply Mr. Garcia's medications. What they're saying is, you had this policy established not by doctors, but by the warden and the people who deal with the security of the system, not to allow inmates to bring their medications into the jail. That wasn't a medical decision, that was a security decision or whatever, a non-professional decision. This circuit, the Texas Supreme Court has said, when an underlying plaintiff alleges both professional and non-professional conduct, such exclusion, a professional liability exclusion will not exclude conduct. The Utica case, this involved a nurse who worked at this clinic, he was addicted to drugs, he would sneak into the drug cabinet, get fentanyl, inject his needle, pull it out, inject himself, and then what happened was, he contaminated all the vials of fentanyl. They sued, and they're saying when they gave the fentanyl to the patients that there was negligence in the administration of fentanyl, professional. The court said that's professional. But there was also an allegation that there was inadequate security for how they secured the fentanyl, more of a premises or a non-professional. The court said that is not professional, and to the extent that the injury was caused by that, and would have happened anyway, there is coverage under the general liability policy. This court in 1990, in the Guarantee National v. North River case, involved a psychiatric institution where a patient jumped out the window to his or her death. There were allegations you should have closely monitored this patient because of her mental status, professional liability. There was also allegations you should have had bars on the windows or fixed screens on the windows to prevent someone from jumping out, non-professional. And the question is, was the general liability policy in that case, which had a professional liability exclusion, did it provide coverage as well? This court said yes, because the issue of whether or not the screen or the bars would have prevented the death was not a professional decision. It was a non-professional, and there was coverage. Now, they say, well, it doesn't make any difference because of concurrent causation. Well, they missed the boat on concurrent causation. The Texas Supreme Court in the Utica case talked about what concurrent causation is, and that is basically where but for the professional services, the injury would not have occurred, then it is concurrent causation. Well, here, we don't have concurrent causation because whether or not a nurse said he does need the drugs or he doesn't need the drugs, he still wouldn't have gotten the drugs because of the administrative policy that had been adopted about not allowing patients to bring their medication into the jail, not administrative. They shot the Duncanville diagnostic case. That was a case where they overdosed a kid who was getting diagnostic testing, and then they alleged, well, there was negligent hiring, training, et cetera. Well, the negligent hiring and training only manifested itself through the professional negligence. That is, even if you had negligent hiring and training, you wouldn't have had the injury but for the professional negligence. That's not true here. It wasn't true in the Guaranteed National case, and it wasn't true in the Utica case. There were separate independent causes, not having the bars in the window versus not monitoring, not properly locking up the fentanyl versus the administration of the fentanyl. Here, the nurse not recognizing the need for medication versus having a policy in place which said we don't allow prisoners to bring medication into the facility. We believe the trial court's interpretation on the general liability policy was a reasonable one. We believe because it was a reasonable one that it will control. We believe that the trial court did make a mistake with respect to the umbrella because of the fact that there was professional and nonprofessional allegations, and they were not concurrent causes in this case. Thank you very much. Okay. Thank you, Mr. Koopman. Mr. Yanov, you have five minutes to rebuttal. First, what the jury found. The underlying trial testimony regarding the nurse's negligence is summarized at page 6 of our red brief in footnote number 3. It includes numerous instances of testimony of nurses falling below acceptable nursing standards. They should have notified the doctor. They should have provided the medication. They should have found somebody to provide the medication. A reasonable nurse would have called the doctor. That's the testimony that was heard at the trial that's already been tried in this case. The jury did not answer yes to the individual defendants. What they answered yes to was LCS's negligence, which was the only claim submitted in that case, on vicarious liability, and they simply didn't answer yes to the individual doctor and nurse, but they answered yes based on nurse's negligence that we've summarized that testimony to, which is in the record. The nurse and the doctor were defendants, correct? They were individual defendants as well, yes. Yes. Additionally, post-verdict, LCS argued for medical liability caps under Texas medical liability statute. They argued this was a medical liability case in the trial post-verdict or after the trial post-verdict. They said this is a medical liability case. There are medical or nursing liability issues in the case. That's what was tried. Therefore, Judge, you should reduce the verdict based on the caps we have in Texas for medical liability, medical liability capping of damages recoverable. Professional doesn't need to be defined in the CUL policy. Professional is well-defined in dictionaries, and it's generally understood to mean official, official or having training. That's what professional services in every case that's interpreted has said. In any case where there is a professional services exclusion, they have excluded out allegations of professional liability by nurses, doctors, giving meds, failing to give meds. Mr. Cooper has referred a number of times to this general principle that the reasonable interpretation, even if there's more than one, the reasonable interpretation of the insured governs. It is not reasonable to ignore the arising out of language in these exclusions. Arising out of language has broad exclusion power, and if the allegation bears any incidental relationship to the excluded conduct, the exclusion applies. LCS doesn't get to ignore that and say, well, our reasonable interpretation is really more consistent with due to. It doesn't have due to language. It has arising out of. It is not reasonable in the CGL policy and the medical services exclusion to ignore the or that separates the ABCD provisions. They don't get to simply pick the one that they like best. The or language means if any of the four applies, the exclusion applies, and it is not reasonable to ignore Duncanville Diagnostics and say it simply doesn't apply. Again, Duncanville Diagnostics is not even a rising out of case. It's a due to case, but the court held in that case that the allegations of policy negligence or administrative negligence and doctor or nursing negligence, that they were one and the same in that case based on the fact that the only way the death happens is based on nursing or doctor negligence. And in a concurrent causation analysis, which, again, Duncanville Diagnostic doesn't do, but in a concurrent causation analysis, anytime the alleged act, here it's failure to give a drug, is the very same policy the insured is arguing they should have had, in other words, a policy to provide the drug, that is always going to fall within concurrent causation because the failure to have the policy can be a cause, but the failure to give the medication is also going to be a cause, and vice versa. The failure to give a medication even with the policy, of course, would be a cause. And so concurrent causation keeps there from being coverage here. Under the CGL policy and the CUL policy, there is no coverage here because of the exclusions. The civil rights endorsement is easily harmonized with the medical services exclusion, and therefore this court should grant judgment on all claims. Thank you. Thank you, Mr. Yanov. I admire your ability to close on the button, on the second. Thank you, Your Honor. William Chris again for the Garcia family. This is your cross appeal, right? Yes, Your Honor. The counsel says don't worry about the jury findings, look at the evidence that supported the jury findings. That's a remarkable clairvoyance because we don't know what evidence the jury chose to believe and chose not to believe other than as represented in the charge, which indicates that they chose not to believe that the only nurse and doctor whose negligence was submitted to them was negligent. They chose not to believe that. In fact, the only way to really harmonize what the jury did with the evidence in the case is that the jury did precisely what the Garcia family is now still alleging against LCS. The jury believed that nobody was professionally negligent, that no doctor or nurse screwed up, but rather that even if there had never been a doctor or a nurse in the prison, Mr. Garcia still would have died because the warden and the prison guards and the housekeepers and the custodians were all advised don't let this guy have his own medication, not some medication from the prison infirmary, not some medication from some doctor employed by the prison. Don't let him take the pills he has in his pocket into the prison. That's why Mr. Garcia died, not because of the action or inaction of any doctor or nurse or other professional. LCS did argue the medical malpractice caps in the trial court. I guess if I had been them, I probably would have too. That's not a judicial admission. In Texas, as the court I'm sure is aware, even if you slip and fall in a hospital, that's considered a medical malpractice claim. That's a definition under Texas law. It is not a definition that is shared by this policy. This policy has a much narrower definition of medical malpractice or professional services, both these policies do, than Texas law does. That's a special Texas law. They can argue whatever they want to try to cap our damages. That doesn't waive or cause any estoppel with respect to the coverage they're seeking under the policy. And the other thing the court needs to be aware of is the district judge, Judge Crane, has not decided whether to impose those medical malpractice caps or not. I think this case, frankly, from my perspective, is fairly simple. I think Mr. Cooper's right. We have a very, very good district judge who decided that a reasonable interpretation of the CGL policy was that the medical services exclusion should be read as a series of subparts, different definitions of medical services under different circumstances. If you look at that A, B, C, and D, it's quite clear, at least to me, that the difference between A and B is that A deals with treatment, whereas B deals with supplies. As Mr. Cooper says, if they had wanted to include supplies or medications under A, the furnishing of medical, surgical, or dental and nursing treatment, including the failure to give somebody their medication, even if a doctor and a nurse was not involved, they could have written the policy that way. Judge Ramos was right. Her interpretation was reasonable. There may be other reasonable interpretations. That resolves the problem under the CGL policy. What nobody spent a lot of time talking about is what we filed our notice of appeal on, which was Judge Ramos's decision on the umbrella policy. Frankly, I think that decision was erroneous. I can understand why the Court made it, but the problem with it is that everyone in this appeal has agreed that this is a four corners case. And if you look within the four corners of the plaintiff's petition in the underlying suit, what you will find is that we specifically alleged that none of the negligence that caused Mr. Garcia's death was caused by the exercise of professional judgment by any person. That's the allegation in the underlying suit. And as long as that's the allegation in the underlying suit and there has been no final judgment in the underlying suit, they have an obligation to defend under the umbrella policy once that obligation is invoked. And that's the other problem, is you really don't decide duty to defend cases involving umbrella policies when the umbrella policy hasn't even been invoked. Thank you. Thank you, Mr. Chris.